IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

```
CORNERSTONE TITLE              *
& ESCROW, INC. et al.          *
                               *
v.                             *    Civil Action No. WMN-12-746
                               *
EVANSTON INSURANCE CO.         *
                               *
*    *    *    *    *    *     *    *    *    *    *    *    *
```

## MEMORANDUM

The parties in this insurance coverage dispute are well
known to each other and to the Court.  Plaintiffs in this case,
Cornerstone Title & Escrow, Inc. (Cornerstone) and Sean Adetula,
were defendants in a previous action involving the same policy
brought by the present Defendant, Evanston Insurance Company
(Evanston).  See Evanston Ins. Co. v. Cornerstone Title &
Escrow, Inc., No. WMN-08-1266 (D. Md. filed May 14, 2008).
Pending before the Court now are cross motions for partial
summary judgment as to Evanston's duty to defend Cornerstone in
a lawsuit filed in the Circuit Court for Baltimore County
styled, Consumer Protection Division v. Michael K. Lewis, Case
No. 24-C-07-007811("the CPD Litigation" or "the Underlying
Suit").  The Motions are fully briefed and are ripe for review.
Upon consideration of the papers, facts, and applicable law, the
Court determines that Defendant's motion will be granted and
Plaintiffs' motion will be denied.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Cornerstone is a title and closing company in Maryland.

Mr. Adetula is the owner of Cornerstone.  Mr. Adetula and

Cornerstone purchased a "Service and Technical Professional

Liability Insurance" policy, EO-831073, for the period beginning

October 1, 2007, to October 1, 2008.  The policy obligates

Evanston to:

> pay on behalf of the Insured the amount of Damages and
> Claim Expenses in excess of the deductible amount
> stated in the Declarations which Insured shall become
> legally obligated to pay resulting from CLAIMS FIRST
> MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR
> THE OPTIONAL EXTENSION PERIOD, IF PURCHASED, AND
> REPORTED IN ACCORDANCE WITH THE PROVISIONS OF CLAIMS
> 1., because of any:
>> (a) act, error, or omission in Professional Services
>>     rendered or that should have been rendered, or
>> (b) Personal Injury committed,
> by the Insured or any person for whom the Insured is
> legally responsible and for whose acts, errors,
> omissions or Personal Injuries the Insured is legally
> responsible, and arising out of the conduct the
> Professional Services specified in Item 6[1] of the
> Declarations.

ECF No. 14-3 at 7-8 (emphasis in original).  The policy contains

a definition of "damages" and a definition of "claim":

---

[1] The parties specified that the Professional Services covered by
the policy were:

> Title Abstracter/Searcher, Title Insurance Agent,
> Rendering Opinions of Title Based Upon Abstracts
> Prepared by the Insured, Escrow Agent Pursuant to
> Written Escrow Instructions Accepted in Writing by the
> Insured, Closing Agent and Notary Public Services, All
> for Others for a Fee.

ECF No. 14-3 at 5.

Damages means the monetary portion of any judgment,
award or settlement and does not include:
  (a) Punitive or exemplary damages, any damages which
      are a multiple of compensatory damages, or fines
      or penalties;
  (b) The restitution of consideration or expenses
      paid to the insured for services or goods;
  (c) Judgments or awards arising from acts deemed
      uninsurable by law.

Claim means a written demand received by the Insured
for Damages, including the service of suit or
institution of arbitration proceedings against the
Insured.

Id. at 7. The policy explicitly provides that Evanston will

defend covered claims, id. at 8, but it also contains numerous

exclusions from coverage. See id. at 9-11. The exclusions

relevant to this matter are:

Claim[s] made against the Insured:

  (a) based upon or arising out of any dishonest,
      deliberately fraudulent, malicious, willful or
      knowingly wrongful act or omission committed by
      or at the direction of the Insured.

  (n) based upon or arising out of the Insured gaining
      any profit or advantage to which the Insured is
      not legally entitled.

  (x) based upon or arising out of the actual or
      alleged theft, conversion, misappropriation,
      disappearance, or any actual or alleged
      insufficiency in the amount of any escrow funds,
      monies, monetary proceeds, or any other assets,
      securities, negotiable instruments, or any other
      things of value; this Exclusion shall apply in
      any and all circumstances, and shall apply
      irrespective of which individual party, or entity
      actually or allegedly committed or caused in
      whole or part the theft, conversion,
      misappropriation, disappearance, or the actual or
      alleged insufficiency in amount.

    (cc) based upon or arising out of the Real Estate
         Settlement Procedures Act (RESPA) or any similar
         state or local legislation.

Id. at 5-6, 9-10.

    On October 24, 2007, the Maryland Attorney General,

Consumer Protection Division ("CPD"), commenced the Underlying

Suit.  The parties agree that the Second Amended Complaint

("SAC"), ECF No. 14-8, in that case is the operative pleading

upon which the present coverage dispute is based.[2]

    CPD alleged that Cornerstone, along with several other

defendants, collectively referred to as the "Foreclosure Rescue

Defendants," engaged "in a foreclosure rescue enterprise, the

main object of which [was] to take title to the homeowners'

residences and to strip the equity that the homeowners [had]

built up in their homes."  ECF No. 14-8 (SAC) at ¶ 16.

Specifically, CPD alleged that the victims of the foreclosure

rescue enterprise were entitled to receive significant funds

from the sale of their homes but Cornerstone, and others,

"prevent[ed] the homeowners from receiving all the funds due to

them."  Id. at ¶ 22.  According to the SAC,

    Cornerstone settlement agents [did] not deliver to
    homeowners the checks for proceeds due to them at
    settlement or afterwards.  Instead, Defendant
    Cornerstone's settlement agents deliver[ed] the
    homeowners' checks to the Lewis Defendants or to

_____

[2] The SAC was filed on August 29, 2008.  ECF No. 14-8 (SAC) at
30.

> Defendant Thomas, who delivers the checks to the Lewis
> Defendants.  Defendant Cornerstone [did] not disclose
> the fact that it provide[d] [the] homeowners' checks
> to other parties.

Id. at ¶ 42.  See also id. at ¶ 96 ("by providing the checks for

the consumers' settlement proceeds to the Lewis Defendants or to

Defendant Thomas, Defendant Cornerstone participated in and

provide[d] substantial assistance to the Lewis Defendants and to

Defendant Thomas in their scheme to strip consumers' equity

using practices that violate[d] the CPA.").  As an example, CPD

pointed to Thurman and Janet Speight's experience with the

defendants in the Underlying Suit.  It alleged that the Speights

were owed $79,499.70 at settlement and "[i]n fact, a check in

that amount was printed by Defendant Cornerstone made payable to

Mr. and Mrs. Speight.  However, instead of delivering the check

to the Speights, Defendant Cornerstone's settlement agent

delivered the Speights' check to Defendant Thomas who gave the

check to Defendant Michael K. Lewis."  Id. at ¶ 45.  After

receiving the check, Lewis represented to the Speights that they

owed previously undisclosed fees that they were required to pay

immediately and had the Speights sign the check over to him.

Id.  "No Defendant disclosed to the Speights at any point that

amounts would be deducted from the final total of their

settlement proceeds."  Id.  After deducting the purported fees,

the Speights were given a check for $7,000 – less than one-tenth

of what they were actually owed.  Id.  In total, CPD alleged

Cornerstone's involvement in thirteen such transactions.  Id. at

¶¶ 53-65.

    In Count I of the SAC, CPD alleged violations of the

Protection of Homeowners in Foreclosure Act ("PHIFA"), Md. Code

Ann., Real Prop. §§ 7-301 et seq.  Against Cornerstone and the

Foreclosure Rescue Defendants, CPD alleged that "[e]ach of the

Foreclosure Rescue Defendants act[ed] on behalf of and in

furtherance of this foreclosure 'rescue' enterprise at various

stages of the scheme.  Each of the Foreclosure Rescue Defendants

is jointly and severally liable for the violations of PHIFA

alleged herein."  ECF No. 14-8 ¶ 69.  In Count II, CPD alleged

that Cornerstone violated the Maryland Consumer Protection Act

("CPA"), Md. Code Ann., Com. Law §§ 13-101 et seq., by making

"false and misleading statements to consumers," and failing "to

state material facts" in violation of Com. Law §§ 13-301 & 13-

303 (specifying "unfair or deceptive trade practices").  ECF No.

14-8 at ¶¶ 88-90.  CPD did not specifically plead Count III

against Cornerstone and the other Foreclosure Rescue Defendants,

but sought restoration of title to the homeowners and to enjoin

the then-present mortgagees from asserting mortgage liens

against the subject properties.  Id. at ¶¶ 99-104.  The gravamen

of the allegations contained in the SAC was that the defendants'

violations of the PHIFA and the CPA allowed them to wrongfully

acquire "money and real property" from the homeowners.  Id. at
¶¶ C & D (Relief Requested).[3]

Cornerstone did retain counsel during the CPD Litigation.
ECF No 14-1 (Pls.' Mem.) at 6.  It avers, however, that it was
unable to pay its attorneys which led to its decision to settle
the lawsuit by entering into a Consent Order with CPD in August
2009.  Id.; see also ECF No. 14-9 (Consent Order).  Despite
agreeing to the Order, Cornerstone denied all of the allegations
contained in the SAC and denied that it had violated the PHIFA
or the CPA.  Nonetheless, Cornerstone obligated itself to pay
"restitution" in the amount of $100,100.  ECF No. 14-9 at 11.
Cornerstone was entitled to reduce its restitution payments by a
portion of any amounts that it paid to settle claims made by the
homeowners involved in the CPD Litigation.  Id. at 13.  The
Consent Order also provided for a variety of injunctive relief
against Cornerstone.  See id. at 7-12.

Cornerstone sought coverage from Evanston under the policy.
Evanston denied Cornerstone's request and, in its correspondence
with Cornerstone, took the position that the policy's definition
of "damages" excluded claims for "restitution."  ECF Nos. 14-5
at 3, 14-6 at 3.

---

[3] In addition, CPD requested that the Foreclosure Rescue
Defendants be enjoined from violating the PHIFA and the CPA, ECF
No. 14-8, ¶¶ A & B, and that they be directed to pay CPD's
litigation costs and penalties for the alleged violations of the
CPA.  Id. at ¶¶ G & H.

Cornerstone and Adetula filed their Complaint in the present case in March 2012. They allege that Evanston owed and breached duties to defend and indemnify Cornerstone in the CPD Litigation. They seek as damages (a) the amount of their attorneys' fees in the CPD Litigation, (b) the amount of their attorneys' fees and costs incurred in defending a collection action brought by their counsel in the CPD Litigation, (c) the amount of any judgment entered against them for unpaid attorneys' fees in the CPD Litigation, (d) attorneys' fees and costs incurred while challenging the coverage position taken by Evanston, (e) the monetary portion of the Consent Order in the CPD Litigation, and (f) other consequential monetary damages. ECF No. 1 ¶¶ 57, 65.

## II.  LEGAL STANDARD

Fed. R. Civ. P. 56 provides that summary judgment is appropriate when there is no dispute of material fact and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In the event that the parties file cross motions for summary judgment, the same standard applies. See Taft Broad. Co. v. United States, 929 F.2d 240, 248 (6th Cir. 1991). "When cross-motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they 'may be probative of the non-existence of a

factual dispute.'" Glaser v. Hartford Cas. Ins. Co., 364 F.
Supp. 2d 529, 533 (D. Md. 2005) (quoting Shook v. United States,
713 F.2d 662, 665 (11th Cir. 1983)).  But, the court must "rule
on each party's motion on an individual and separate basis,
determining, in each case, whether a judgment may be entered in
accordance with the Rule 56 standard." Towne Mgmt. Corp. v.
Hartford Acc. & Indem. Co., 627 F. Supp. 170, 172 (D. Md. 1985).

**III. DISCUSSION**

        Summary judgment is appropriate in this case because there
is no dispute as to the terms of the policy in light of the SAC,
only their meaning.[4]  Bolton Partners Inv. Consulting Group, Inc.
v. Travelers Indem. Co. of Am., Case No. RDB-05-2724, 2007 WL
776675, at *3 (D. Md. Mar. 15, 2007) ("Resolution by summary
judgment is appropriate under Maryland law where there is no
dispute as to the terms of an insurance contract but there is a
dispute as to the legal meaning to be accorded those terms."
(citing Utica Mut. Ins. Co. v. Miller, 746 A.2d 935, 939 (Md.
Ct. Spec. App. 2000))).  Thus, the only question here is a legal
one – whether the allegations in the SAC triggered a duty to

---

[4] In a Joint Status Report, ECF No. 10, submitted to the Court in
May 2012, counsel noted their "agreement that resolution of the
issue of the duty to defend is appropriate for resolution by
partial summary judgment, as there are no genuine disputes of
material fact regarding the content of the pleadings and other
documents filed in the Circuit Court for Baltimore City in the
underlying lawsuit or the contents of the insurance policy."
Id. at 1.

defend by Evanston under the policy – which is properly resolved by the Court at this stage.

Under Maryland law, determining whether an insurer has a duty to defend is a two-step process. St. Paul Fire & Marine Ins. Co. v. Pryseski, 438 A.2d 282, 285 (Md. 1981). First, the court must review the policy to determine the scope of, and any limitations on, the coverage. Id.; Aetna Cas. & Sur. Co. v. Cochran, 651 A.2d 859, 862 (Md. 1995). The court should construe the policy as an ordinary contract, giving "the words their usual, ordinary, and accepted meaning" that is, the "meaning a reasonably prudent layperson would attach to the term." Bausch & Lomb Inc. v. Utica Mut. Ins. Co., 625 A.2d 1021, 1031 (Md. 1993). With one caveat noted below, in Maryland, unlike in other jurisdictions, the policy language is not construed against the insurer. Id.; Cheney v. Bell Nat. Life Ins. Co., 556 A.2d 1135, 1138 (Md. 1989). Second, the court must determine whether any of the allegations in the underlying action would potentially be covered under the policies. Pryseski, 438 A.2d at 285; Cochran, 651 A.2d at 862.[5] If there

---

[5] As Plaintiffs note, an insurer's duty to defend is broader than its duty to indemnify. ECF No. 14-1 (Pls.' Mem.) at 11 (quoting Perdue Farms Inc. v. Travelers Cas. & Sur. Co. of Am., 448 F.3d 252, 257 (4th Cir. 2006)); see also Emanuel v. Ace Am. Ins. Co., Case No. ELH-11-875, 2012 WL 2994285, at *2 (D. Md. July 20, 2012) ("the duty to defend is broader than the duty to indemnify" (quoting Walk v. Hartford Cas. Ins. Co., 852 A.2d 98, 106 (Md. 2004))). This is because "a liability insurer is

is any doubt as to "whether or not the allegations of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in insured's favor." Cochran, 651 A.2d at 864 (quoting United States Fid. & Guar. Co. v. Nat'l Paving Co., 178 A.2d 872, 879 (Md. 1962)).

The parties' arguments focus on two general issues: (1) whether the relief requested by CPD in the SAC came within policy's definition of "damages," and (2) whether any of the policy's exclusions applied to the claims in the SAC.

## A.    The Relief Requested in the Second Amended Complaint Met the Policy's Definition of "Damages"

Evanston denied Cornerstone's request for coverage on the ground that "the policy contains a definition of 'damages' with a specific exception for 'restitution'" and thus, because the CPD only sought restitution, the SAC was not a claim for covered damages. ECF Nos. 14-5 at 3 & 14-6 at 3. Plaintiffs contest Evanston's interpretation of the policy's definition of "damages."

---

obligated to defend its insured against a tort lawsuit so long as the 'allegations in the tort action potentially bring the tort claim within the policy's coverage.'" Emanuel, 2012 WL 2994285, *2 (quoting Pryseski, 438 A.2d at 285) (emphasis added). By contrast, an insurer's duty to indemnify "is triggered only if the insured's established liability is actually covered under the policy." Id. (emphasis supplied).

The resolution of this issue is far simpler than the parties' extensive briefing on it would suggest.  The policy defines damages as "the monetary portion of any judgment, award or settlement."  ECF No. 14-3 at 7 (emphasis added).  Damages does not include, "[t]he restitution of consideration or expenses paid to the insured for services or goods."  Id. "It is a recognized rule of construction that a contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause or phrase so that a court does not cast out or disregard a meaningful part of the writing."  Bausch & Lomb, 625 A.2d at 1033; see also Balt. Gas & Elec. Co. v. Commercial Union Ins. Co., 688 A.2d 496, 503 (Md. Ct. Spec. App. 1997).  Evanston offers two arguments related to the policy's definition of "damages," neither of which are faithful to this basic principle of contract interpretation.  In the first instance, Evanston points out that restitution and damages are distinct remedies.  See ECF No. 18 (Def. Reply) at 7.  This is certainly true as a general principle of the law of remedies. It does not, however, allow Evanston to avoid the explicit definition of damages included in the policy.  The policy makes no distinctions between legal and equitable remedies when it defines "damages" as "the monetary portion of any judgment, award or settlement."  ECF No. 14-3 at 7 (emphasis added).

Second, Evanston suggests that "the Policy contains a definition of 'damages' with a specific exception for 'restitution.'" ECF No. 16-1 (Def.'s Mem.) at 17.  The Court finds this line of argument to be particularly disingenuous in light of the applicable standard of contract interpretation. Evanston attempts to lead the Court into the very danger that the court in <u>Bausch & Lomb</u> cautioned against: "cast[ing] out or disregard[ing] a meaningful part of the writing."  625 A.2d at 1033.  By the policy's terms, the only restitution that is excluded from the definition of "damages" is restitution "for consideration or expenses paid to the insured for services or goods." ECF No. 14-3 at 7.  In the CPD Litigation, CPD sought to recover the homeowners' stripped equity from the defendants, not "consideration or expenses paid to [Cornerstone] for services or goods."  Thus, the Court concludes that the policy's definition of "damages" does not provide Evanston with a basis for denying coverage in the CPD litigation.

**B.    The Second Amended Complaint Stated Only Claims That Were Excluded From Coverage**

   **1.    The Court's Ruling in <u>Evanston Ins. Co. v. Cornerstone Title & Escrow, Inc.</u>, Does Not Prevent Evanston From Raising the Policy's Exclusions in This Case**

Plaintiffs argue, under the doctrine of claim preclusion, that the undersigned's opinion in <u>Evanston Ins. Co. v.</u>

Cornerstone Title & Escrow, Inc., supra at 1 (ECF No. 19),
prohibits Evanston from asserting here that the exclusions
contained in the policy limit its duty to defend.  In that case,
Evanston sought a declaratory judgment determining the parties'
rights and obligations under the same policy at issue here,
based on an action brought by one of the homeowners involved in
the CPD litigation captioned Terry Massey v. Earnest Lewis, et.
al., Case No. 08-cv-00261-AMD.

    For claim preclusion to apply, three requirements must be
met: "1) the parties must be the same or in privity with the
original parties; 2) the claims in the subsequent litigation
must be substantially the same as those in the prior litigation;
and 3) the earlier litigation must have resulted in a final
judgment on the merits."  Shoup v. Bell & Howell Co., 872 F.2d
1178, 1179 (4th Cir. 1989).  Without delving into the first two
elements, the second of which is vigorously disputed by
Evanston, Plaintiff's argument certainly fails to meet the third
requirement – "a final judgment on the merits."

    Federal law controls the determination of whether an
earlier judgment has a preclusive effect on a later proceeding,
Harnett v. Billman, 800 F.2d 1308, 1312-13 (4th Cir. 1986), and
"the general principal is to avoid duplicative litigation."
Colorado River Water Conservation District v. United States, 424
U.S. 800, 817 (1976).  Plaintiffs point to the last paragraph of

the Court's opinion in <u>Evanston Ins. Co.</u>, <u>supra</u> at 1, as the

purported final judgment which bars Evanston from raising the

issue of the policy's exclusions here.[6]   Yet Plaintiffs fail to

give any effect to, or even mention, the Court's express

decision not to consider the policy exclusions in its prior

opinion.   There, the Court concluded that "[b]ecause Evanston's

allegations related to [the policy] exclusions require the

---

[6] In its entirety, the final paragraph of that opinion reads:

> Evanston's Complaint, however, is not confined to that
> issue.   Instead, the Complaint also includes arguments
> that Evanston owes no coverage to Defendants for the
> Underlying Action because of multiple exclusions
> included in the Policy.   For example, Evanston seeks a
> declaration that it owes no duty to defend because the
> Policy does not apply to any claim made against the
> insured "based upon or arising out of any dishonest,
> deliberately fraudulent, malicious, willful or
> knowingly wrongful act or omission committed by or at
> the direction of the Insured."   Policy at 4.   The
> issue of whether Defendants willfully and knowingly
> committed wrongful acts or omissions has been
> expressly raised by Massey in the Underlying Action.
> The SAC alleges, <u>inter</u> <u>alia</u>, that Defendants
> "knowingly and repeatedly falsified the HUD-1s
> Settlement Statements," "wrongfully filed" deeds,
> "concealed their knowledge" of an illegal scheme, and
> "furthered the illegal scheme against Ms. Massey by
> knowingly recording deeds and deeds of trust which
> were void."   Because Evanston's allegations related to
> these exclusions require the resolution of issues
> pending in the Underlying Action, consideration of
> these allegations would be premature at this time.
> Thus, after ruling against Evanston on the one issue
> ripe for adjudication in this case, this Court will
> grant Defendants' motion to dismiss.

<u>Evanston Ins. Co.</u>, <u>supra</u> at 1 (ECF No. 19 at 9).

resolution of issues pending in the Underlying Action,
<u>consideration of these allegations would be premature at this
time</u>." Evanston Ins. Co., <u>supra</u> at 1 (ECF No. 19 at 9).
Because there was not final judgment on the merits (or even any
consideration, for that matter) concerning the policy's
exclusions in <u>Evanston</u>, the issue is not precluded here.

### 2.   The Second Amended Complaint Did Not Allege Any Covered Claims

Evanston argues that it did not owe Cornerstone a duty to
defend in the CPD Litigation because the SAC comes within
several of the policy exclusions.  Specifically, Evanston argues
that exclusions (a), (n), and (x), <u>supra</u> at 3, limit its duty to
defend Cornerstone.  According to Evanston "[t]he overall tenor
of the SAC is clear that Cornerstone and the Lewis Defendants
acted willfully and intentionally in perpetrating an alleged
scheme to deprive minority homeowners of the equity in their
homes."  ECF No. 16-1 (Def.'s Mem.) at 21.

Plaintiffs respond by arguing that the PHIFA and CPA can be
violated by unintentional, non-willful conduct.  ECF No. 17 (Pl.
Opp'n) at 19.  They note that throughout the CPD Litigation
Cornerstone denied violating the PHIFA and the CPA, and point
out that there has never been any adjudication that Cornerstone
engaged in fraudulent or dishonest acts, or otherwise acted
willfully or intentionally to assist in the complained of

scheme.  Id. at 18-19.  As a result, they suggest that there is some doubt as to whether the allegations contained in the SAC trigger a duty by Evanston to defend, and that this doubt must be resolved in their favor.  Id. at 18 (citing, inter alia, Miller, 746 A.2d at 939; Litz v. State Farm Fire & Cas. Co., 695 A.2d 566, 570 (Md. 1997)).

The problem for Plaintiffs is that there is no doubt as to allegations contained in the SAC.  The only reasonable reading of the SAC is that Cornerstone wrongfully denied the homeowners proceeds from the sale of their homes to which they were entitled.  Whether Cornerstone and its agents acted intentionally or willfully is of little consequence – neither is required to trigger exclusions (n) and (x).  All either of those exclusions require is that the claim be based on or arise from allegations (1) that Cornerstone "gain[ed] any profit or advantage to which [it was] not legally entitled," or (2) of "misappropriation, disappearance, or any actual or alleged insufficiency in the amount of any escrow funds, monies, monetary proceeds, or any other assets . . . irrespective of which individual party, or entity actually or allegedly committed or caused in whole or part" the misappropriation, disappearance or insufficiency.  ECF No. 14-3 at 5-6, 9-10. This is precisely what the CPD alleged in the SAC.  See, e.g., ECF No. 14-8 (SAC) at ¶¶ 16, 22, 42, 45, 53-65, 96, C & D.

17

Moreover, Cornerstone's denial of liability throughout the litigation and in the Consent Order, and the absence of a determination of liability, is not controlling.  As Evanston points out, the Court of Special Appeals addressed a similar situation in <u>Miller</u>.  There, "the gravamen" of the underlying complaint was that the insured failed to remit monies it had collected on behalf of Insurance Company of North America. <u>Miller</u>, 746 A.2d at 941.  The policy contained an exclusion for claims arising out of "[a]ny liability for money received by an insured or credited to an insured for fees, premiums, taxes, commissions, loss payments, or escrow or brokerage monies."  <u>Id.</u> at 940.  The court held that the lack of a determination that the insured was liable did not impact the application of the exclusion because it "applie[d] to any <u>claim</u> of liability for money received."  <u>Id.</u> at 941 (emphasis in original).  In addition, the court held that the insured's denial of liability did not trigger an obligation to defend claims to which the exclusion applied because doing so "would render the exclusion meaningless."  <u>Id.</u>  The policy in the instant case also precludes coverage for any <u>claim</u> that meets the exclusions.  ECF No. 14-3 at 9.  Because the Court has found that the CPD only alleged conduct that meets exclusions of the policy – (n) and (x), at minimum – it finds that the SAC did not state any covered claims and Evanston was not obligated to defend

Cornerstone in the CPD Litigation.[7]  Therefore, Evanston's motion

for partial summary judgment will be granted.[8]

## IV.    CONCLUSION

For the foregoing reasons, Evanston's Motion for Partial

Summary Judgment will be granted and Plaintiffs' Motion for

Partial Summary Judgment will be denied.  A separate order will

issue.


                                    _____/s/_____
                                    William M. Nickerson
                                    Senior United States District Judge


DATED: January 30, 2013

---

[7] To the extent that Plaintiffs argue that CPD's request for
litigation costs in the CPD Litigation obligates Evanston to
provide a defense, the reasoning of the Miller court dispatches
with Plaintiff's position.  746 A.2d at 941.  Requiring an
insurer to provide a defense whenever the plaintiff in the
underlying action seeks litigation costs or statutory penalties,
even if the alleged wrongful conduct meets exclusions of the
policy, would render the exclusions meaningless.

[8] In light of the Court's decision here, and because an insurer's
duty to defend is broader than its duty to indemnify, see Perdue
Farms Inc., 448 F.3d at 257, it appears that Count II of
Plaintiffs' Complaint is no longer viable.  If Plaintiffs
disagree, they are invited to submit a status report for the
Court's consideration within seven days.  Otherwise, the Court
will exercise its discretion to enter summary judgment on Count
II sua sponte.  See Celotex Corp. v. Catrett, 477 U.S. 317, 326
(1986) ("[D]istrict courts are widely acknowledged to possess
the power to enter summary judgments sua sponte, so long as the
losing party was on notice that she had to come forward with all
of her evidence.").