IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

```
CORNERSTONE TITLE           *
& ESCROW, INC. et al.       *
                            *
v.                          *      Civil Action No. WMN-12-746
                            *
EVANSTON INSURANCE COMPANY  *
                            *
   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
```

**MEMORANDUM**

This case, which is before this Court on remand from the Fourth Circuit Court of Appeals, concerns the obligations of Defendant Evanston Insurance Company ("Evanston") to Plaintiffs, Cornerstone Title & Escrow, Inc. ("Cornerstone") and Sean Adetula, under a professional liability insurance policy. This Court previously entered summary judgment in favor of Evanston as to its duty to defend and its duty to indemnify Cornerstone on the basis that at least two policy exclusions eliminated Defendant's obligation to provide coverage for the litigation underlying this dispute. The Court did not reach the applicability of two additional exclusions. On appeal, the Fourth Circuit reversed, instructing this Court to enter partial summary judgment in favor of Plaintiffs on the issue of the duty to defend as to those exclusions, vacate its previous entry of summary judgment in favor of Evanston as to its duty to indemnify, and consider the remaining two exclusions briefed by

1

the parties in their cross-motions for summary judgment.  Having determined that no hearing is necessary, Local Rule 105.6, the Court will now do so.

### I.    FACTUAL AND PROCEDURAL BACKGROUND

In 2008, the Maryland Attorney General sued Cornerstone and ten other defendants for roles played in a foreclosure rescue scheme in the Circuit Court for Baltimore County.  See Second Amended Complaint ("SAC") in Consumer Protection Division v. Michael K. Lewis, Case No. 24-C-07-007811, ECF No. 1-5.  In this scheme, various individuals (referred to collectively as the "Lewis Defendants") marketed foreclosure-consulting services to homeowners at risk of losing their homes.  The Lewis Defendants would convince the homeowners to enter into sale-leaseback agreements, through which the homeowner would sell his or her home to the Lewis Defendants and rent it back, with the hope and intention of rebuilding his or her credit and repurchasing the property in the future.

In reality, the Lewis Defendants would return to the homeowners very little of the equity they had built up in their homes.  Instead, the Lewis Defendants would inform the homeowners that unspecified fees and charges consumed whatever equity they had in their homes, and convince them to sign the settlement checks over to the Lewis Defendants.  The Lewis Defendants would then charge the homeowners monthly rent

2

exceeding their original mortgage payments, "driving the homeowner out of her home and ending any chance for her to repurchase it in the future." Cornerstone Title & Escrow, Inc. v. Evanston Ins. Co., No. 13-1318, 2014 WL 631098, at *2, ___ F. App'x ___, ___ (4th Cir. Feb. 19, 2014).  Through this scheme, homeowners lost "both the title to their homes and the vast majority of equity they had built up in their homes."[1]  SAC ¶ 16.

Although the primary perpetrators of the scheme were the Lewis Defendants, the SAC details thirteen transactions in which Cornerstone allegedly acted as settlement agent.  The SAC asserts that Cornerstone acted improperly by delivering the settlement checks to the Lewis Defendants rather than the homeowners in the first instance, as well as in failing to disclose this action to the homeowners.  See SAC ¶ 96.  Although the conduct alleged against Cornerstone directly was limited to its behavior with respect to the settlement checks, the SAC charges Cornerstone with violations of the Protection of Homeowners in Foreclosure Act, Md. Code Ann., Real Prop. §§ 7-301, et seq. ("PHIFA"), and the Maryland Consumer Protection Act, Md. Code Ann., Com. Law, §§ 13-101, et seq. ("CPA").  To the extent that the allegations are not asserted directly against Cornerstone, the Attorney General sought to hold

---

[1] Further description of this scheme can be found in this Court's previous opinion, as well as that of the Fourth Circuit.  See ECF No. 19; Cornerstone, 2014 WL 631098, ___ F. App'x ___.

Cornerstone jointly and severally liable for the actions of the
other defendants, asserting that Cornerstone provided
substantial assistance in the foreclosure rescue scheme.  See,
e.g., SAC ¶¶ 22 ("[A]t settlement, with the aid and assistance
of Defendants Thomas and Cornerstone, the Lewis Defendants
prevent the homeowners from receiving all the funds due to
them."); 69 ("Each of the Foreclosure Rescue Defendants is
jointly and severally liable for the violations of PHIFA alleged
herein.").  Cornerstone eventually entered into a settlement
agreement by which it agreed to pay $100,100 in restitution,
while maintaining that it was not responsible for the conduct
alleged.  See ECF No. 1-6 (Consent Order).

Cornerstone filed the present action, alleging that
Evanston owed it a duty to defend and a duty to indemnify in the
underlying action pursuant to its professional liability
insurance policy, EO-831073, which covered the period beginning
October 1, 2007, to October 1, 2008 ("the Policy").[2]  In relevant
part, the Policy provides that Evanston will pay "the amount of
Damages and Claims Expenses . . . because of any (a) act, error
or omission in Professional Services rendered . . . or (b)
Personal Injury committed [by Cornerstone]," and "investigate,

---

[2] Cornerstone had sought coverage under the Policy from Evanston
during the pendency of the underlying litigation, but Evanston
denied coverage.

defend and settle any Claim to which coverage under this policy applies." [3]  ECF No. 14-3 at 7-8.  Evanston argues, however, that it did not owe a duty to defend the underlying action because of the applicability of the following provisions, which exclude from coverage claims made against the insured:

> (a)  based upon or arising out of any dishonest, deliberately fraudulent, malicious, willful or knowingly wrongful act or omission committed by or at the direction of the Insured.
>
> (n)  based upon or arising out of the Insured gaining any profit or advantage to which the Insured is not legally entitled.
>
> (x)  based upon or arising out of the actual or alleged theft, conversion, misappropriation, disappearance, or any actual or alleged insufficiency in the amount of any escrow funds, monies, monetary proceeds, or any other assets, securities, negotiable instruments, or any other things of value; this Exclusion shall apply in any and all circumstances, and shall apply irrespective of which individual party, or entity actually or allegedly committed or caused in whole or part the theft, conversion, misappropriation, disappearance, or the actual or alleged insufficiency in amount.
>
> (cc) based upon or arising out of the Real Estate Settlement Procedures Act (RESPA) or any similar state or local legislation.

Id. at 5-6, 10.

---

[3] As "the duty to defend is broader than the duty to indemnify" under Maryland law, Perdue Farms, Inc. v. Travelers Cas. & Surety Co. of Am., 448 F.3d 252, 257 (4th Cir. 2006), the parties have neither conducted discovery regarding, nor briefed, the duty to indemnify issue.  The Court will not, therefore, discuss here the extent of the duty to indemnify under the Policy.

Upon considering the Policy initially, this Court determined that exclusions (n) and (x) applied to bar coverage, reasoning that "[t]he only reasonable reading of the SAC is that Cornerstone wrongfully denied the homeowners proceeds from the sale of their homes to which they were entitled."[4]  ECF No. 19 at 17.  Focusing on the SAC as a whole, the Court determined that it "only alleged conduct that meets exclusions of the policy – (n) and (x), at minimum[.]"  Id.  Having determined that the conduct in the underlying action fell within the bounds of exclusions (n) and (x), the Court did not reach consideration of exclusions (a) and (cc), and ultimately entered judgment in favor of Evanston as to both the duty to defend and the duty to indemnify.  See ECF Nos. 20, 21.  Cornerstone appealed.

The Fourth Circuit reversed, determining that this Court erred in focusing on the "gravamen" of the Complaint instead of parsing the individual allegations pursued by the Attorney General against Cornerstone.  Specifically, as to exclusion (n), the Court determined that the SAC "did not allege that any particular 'profit' or 'advantage' inured to Cornerstone's benefit, as exclusion (n) requires."  Cornerstone, 2014 WL 631098, at *5.

---

[4] The Court also considered additional arguments made by the parties that were not challenged on appeal, including Evanston's characterization of the restitution paid by Cornerstone pursuant to the Consent Order as excluded damages under the Policy.  The Court will not rehash or reconsider those arguments here.

As to exclusion (x), the Fourth Circuit rejected Evanston's assertion that Cornerstone's misdirection of settlement checks amounted to conversion, but stated that even if it did, Evanston's duty to defend would nonetheless be triggered because "other allegations in the Attorney General's complaint are not within the ambit of that exclusion[.]" Id. at *8.  Noting again the allegations of nondisclosure and that the "underlying complaint attempts to impose liability on Cornerstone for acts of its co-defendants that have no connection at all to misdirected checks," the Fourth Circuit determined that reversal was appropriate.  Id.  It instructed this Court to consider on remand whether exclusions (a) or (xx) applied to relieve Evanston of its duty to defend.[5]

## II.  LEGAL STANDARD

Summary judgment is appropriate if the record before the court "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 377 U.S. 317, 322-23 (1986).  "When cross-motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they 'may be probative of the non-existence of a factual dispute.'"  Glaser v. Hartford Cas.

---

[5] This Court invited, but did not require, the parties to submit additional briefing prior to its consideration of this case on remand.

Ins. Co., 364 F. Supp. 2d 529, 533 (D. Md. 2005) (quoting Shook
v. United States, 713 F.2d 662, 665 (11th Cir. 1983)).  The
Court must nonetheless "rule on each party's motion on an
individual and separate basis, determining, in each case,
whether a judgment may be entered in accordance with the Rule 56
standard."  Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co., 627
F. Supp. 170, 172 (D. Md. 1985).

     As this Court noted previously, summary judgment is
appropriate in this case "because there is no dispute as to the
terms of the policy in light of the SAC, only their meaning."
ECF No. 19 at 9 (citing Bolton Partners Inv. Consulting Grp.,
Inc. v. Travelers Indem. Co. of Am., Civ. No. RDB-05-2724, 2007
WL 776675, at *3 (D. Md. Mar. 15, 2007)).  Because there is no
dispute of material fact, the only issue to be determined by
this Court is whether the allegations of the SAC triggered a
duty to defend on the part of Evanston.

     III. **ANALYSIS**

     Left for resolution by this Court are whether exclusions
(a) or (cc) apply to bar coverage under the Policy.  The duty to
defend "refers to an insurer's obligation to defend its insured
when a third party files suit."  Perdue Farms, 448 F.3d at 257.
As set out more thoroughly by the Fourth Circuit on appeal, see
Cornerstone, 2014 WL 631098, the duty to defend is "construed
liberally in favor of the policyholder."  Pac. Emp'rs Ins. Co.

v. Eig, 864 A.2d 240, 248 (Md. Ct. Spec. App. 2004).  In
considering whether the duty to defend is triggered, Maryland
courts ask "(1) what is the coverage and what are the defenses
under the terms and requirements of the insurance policy? [and]
(2) do the allegations in the [underlying] tort action
potentially bring the tort claim within the policy's coverage?"
Cowan Sys., Inc. v. Harleysville Mut. Ins. Co., 457 F.3d 368,
372 (4th Cir. 2006) (alterations in original).

   Insurance policies are, in Maryland, construed under
general principles of contract interpretation.  Thus, the policy
is construed as a whole, and words are accorded their "usual,
ordinary and accepted meaning unless there is evidence that the
parties intended to employ it in a special or technical sense."
Clendenin Bros., Inc. v. U.S. Fire Ins. Co., 889 A.2d 387, 393
(Md. 2006) (quoting Cheney v. Bell Nat'l Life Ins. Co., 556 A.2d
1135, 1138 (Md. 1989)).  To the extent that there is ambiguity
in the language of the policy, it will be construed liberally in
favor of the insured.  Dutta v. State Farm Ins. Co., 769 A.2d
948, 957 (Md. 2001).  Exclusions, however, are interpreted
narrowly and "construed in favor of a finding of coverage," with
the burden on the insurer to show that an exclusion applies.
Cornerstone, 2014 WL 631098, at *5 (quoting Megonnell v. United
Servs. Auto Ass'n, 796 A.2d 758, 772 (Md. 2002)).

A potentiality that the claim could be covered is sufficient to trigger the insurer's duty to defend – that is, "the underlying tort suit need only <u>allege</u> action that is <u>potentially covered</u> by the policy, no matter how attenuated, frivolous, or illogical that allegation may be." <u>Sheets v. Brethren Mut. Ins. Co.</u>, 679 A.2d 540, 544 (Md. 1996). Moreover, "if any claims potentially come within the policy coverage, the insurer is obligated to defend all claims, notwithstanding alternative allegations outside the policy's coverage." <u>Perdue Farms</u>, 448 F.3d at 257 (quoting <u>Utica Mut. Ins. Co. v. Miller</u>, 746 A.2d 935, 940 (Md. Ct. Spec. App. 2000)).

### A. <u>Exclusion (a) Does Not Defeat Coverage</u>

Evanston contends that exclusion (a), which relieves Evanston of a duty to defend claims "based upon or arising out of any dishonest, deliberately fraudulent, malicious, willful or knowingly wrongful act or omission committed by or at the direction of [the insured]," bars coverage under the Policy. <u>See</u> ECF No. 16-1 at 20. Noting that "[t]he overall tenor of the SAC is clear that Cornerstone and the Lewis Defendants acted willfully and intentionally in perpetrating an alleged scheme to deprive minority homeowners of the equity in their homes," <u>id.</u> at 21, Evanston argues that the claims in the SAC "arise out of" dishonest, deliberate fraudulent, malicious, willful, or

knowingly wrongful acts.  In particular, Evanston points to
Paragraph 22 of the SAC, which alleges that,

> at settlement, with the aid and assistance of
> Defendants Thomas and Cornerstone, the Lewis
> Defendants prevent the homeowners from receiving all
> the funds due to them.  Through various unfair and
> deceptive practices in violation of the CPA, they have
> the homeowners sign over the checks to the Lewis
> Defendants. The result of these improper and illegal
> practices by the Foreclosure Rescue Defendants is to
> allow the Lewis Defendants to take the homeowners'
> equity, a practice commonly referred to as "equity
> stripping."

SAC ¶ 22.

In contrast, Cornerstone argues that, based on the plain
language of exclusion (a), it applies to bar coverage only for
claims arising out of such acts committed <u>by or at the direction</u>
<u>of Cornerstone</u>.  Because the SAC is premised in major part on
the actions of Cornerstone's co-defendants and seeks to hold
Cornerstone liable for that conduct, Cornerstone asserts that
the majority of the SAC's allegations fall outside of the ambit
of exclusion (a).  Moreover, Cornerstone contends, neither the
CPA nor PHIFA require that the wrongful act charged was
committed deliberately or knowingly.  <u>See</u> Md. Code Ann., Com.
Law § 13-410(d)(2); Md. Code Ann., Real Prop. § 7-320(c).  At
most, Cornerstone argues, exclusion (a) would apply to some –
but not all – of the allegations in the Complaint, and thus
would not relieve Evanston of its duty to defend.

The Court agrees with Cornerstone.  The plain language of the Policy exclusion at issue makes clear that, to the extent the exclusion applies, it applies only to conduct "committed by or at the direction of [Cornerstone]."  As the Fourth Circuit noted on appeal, however, "[t]he Attorney General sought to hold Cornerstone responsible not just for its own alleged failure to disclose, but also for its co-defendants' acts." Cornerstone, 2014 WL 631098, at *2.  To the extent that the SAC alleges actions taken "by or at the direction of" Cornerstone, it is limited to Cornerstone's delivery of settlement checks to the Lewis Defendants and its failure to disclose such action to the homeowners.  The SAC alleges a whole host of other behavior, seeking to hold Cornerstone liable for "a laundry list of statutory violations committed by its co-Defendants."  Id. There is no serious argument – and Evanston does not contend – that the SAC alleges that the Lewis Defendants were acting at the behest of Cornerstone.

Moreover, Cornerstone is correct that neither the CPA nor PHIFA require that a defendant acted knowingly or willfully in order to be held liable. See Md. Code Ann., Com. Law § 13-410(d)(2) (providing that good faith is a defense that permits lessened statutory penalties upon a finding of a CPA violation); Md. Code Ann., Real Prop. § 7-320(c) (permitting a heightened damages award "[i]f a court finds that the defendant willfully

or knowingly" violated PHIFA).  Thus, to the extent that the SAC
alleges actions "committed by or at the direction of"
Cornerstone, a finding of liability does not require that
Cornerstone's alleged actions or omissions were "dishonest,
deliberately fraudulent, malicious, willful or knowingly
wrongful."

The SAC does not specifically attribute any state of mind
to Cornerstone.  Additionally, throughout all proceedings in the
underlying litigation, Cornerstone denied liability for the
conduct alleged against it.  See generally Litz v. State Farm
Fire & Cas. Co., 695 A.2d 566, 570 (Md. 1997) (noting that the
insured may introduce extrinsic evidence to establish a
potentiality of coverage because "the insurer should not be
allowed to refuse to defend based solely on allegations in the
complaint because the insured is completely at the mercy of the
tort plaintiff's pleadings to establish a potentiality of
coverage").  No adjudication as to liability – let alone
Cornerstone's state of mind – ultimately occurred.  See ECF 1-6
at ¶¶ 16, 19 (Consent Order in which "Cornerstone denie[d] the
allegations in the Second Amended Complaint, denie[d] that it
engaged in unfair or deceptive trade practices in violation of
the CPA, and denie[d] that it engaged in any violations of
PHIFA" and to which Cornerstone consented to entry "for the
purposes of settlement only, without this Consent Order

constituting evidence against or any admission by any party"). Thus, it appears that there remains a potentiality – however slight – that those claims may fall outside of exclusion (a). Accordingly, because the exclusion must be construed narrowly and in favor of the insured, and because the insurer is obligated to defend wherever a potentiality of coverage exists, the Court determines that exclusion (a) does not relieve Evanston of its duty to defend.

### B. **Exclusion (cc) Does Not Defeat Coverage**

Pursuant to exclusion (cc), Evanston is relieved of its duty to defend claims "based upon or arising out of the Real Estate Settlement Procedures Act (RESPA) or any similar state or local legislation."  Evanston asserts that the CPA and PHIFA are "similar" to RESPA, and thus, exclusion (cc) bars coverage. Cornerstone, however, contends that (1) the CPA and PHIFA are not similar to RESPA and the SAC contains no allusion to RESPA, or, alternatively, that (2) the phrase "similar state or local legislation" is ambiguous and should be resolved in favor of the insured.

There is plainly no reference to RESPA in the SAC and thus, the key question is whether the CPA or PHIFA – from which the claims in the SAC arise – are "similar" to RESPA.  The Policy does not clarify what it means by "similar state or local legislation."  Evanston, while not defining the term, appears to

14

premise its argument for exclusion on the relative purposes of
the statutes, noting, in essence, that all three apply to real
estate transactions and focus on protecting consumers.

The word "similar" is not, by itself, ambiguous.  Putting
aside Cornerstone's argument that exclusion (cc) is susceptible
to more than one interpretation,[6] the Court disagrees with
Evanston's contention that PHIFA and CPA are "similar" to RESPA.
Similar is commonly defined as "nearly but not exactly the same
or alike; having a resemblance."  Webster's New World Dictionary
of American English 1250 (3d College ed. 1988).  RESPA concerns
real estate settlement services relating to federally regulated
mortgage loans.  It was enacted to "insure that consumers
throughout the Nation are provided with greater and more timely
information on the nature and costs of the settlement process
and are protected from unnecessarily high settlement charges
caused by certain abusive practices that have developed in some
areas of the country."  12 U.S.C. § 2601.  Specifically,
Congress sought to achieve "more effective advance disclosure"
of settlement costs, "the elimination of kickbacks or referral
fees," "reduction in the amounts home buyers are required to
place in escrow accounts," and "significant reform and
modernization of local recordkeeping of land title information."

---

[6] The Court notes that, to the extent that there is ambiguity in
the provision, it must be construed in favor of the insured.
Dutta, 769 A.2d at 957.

15

Id.  Thus, it would appear to the Court that to fall within the definition of "similar state or local legislation," PHIFA and/or the CPA would have to have the primary purpose of curbing abuses in the real estate settlement process, specifically related to the disclosure of fees and elimination of kickbacks and referrals.

PHIFA was enacted to regulate purchase transactions involving homes in foreclosure, in reaction to "growing mortgage foreclosure abuses."  See Johnson v. Wheeler, 492 F. Supp. 2d 492, 503 (D. Md. 2007).  The act applies specifically to "foreclosure consultants," "foreclosure consulting services," and "foreclosure purchasers," Md. Code Ann., Real. Prop § 7-301, and places certain obligations on foreclosure consultants and foreclosure consulting services to provide homeowners with full information regarding the services to be provided.  It regulates the precise type of "services" provided to homeowners by the Lewis Defendants, and aims to protect the homeowners' rights by requiring disclosures of certain information.  See Md. Code Ann., Real Prop. § 7-301 et seq.; Johnson, 492 F. Supp. 2d at 503-04 (describing PHIFA in some detail).

The CPA aims to "set certain minimum statewide standards for the protection of consumers across the State."  Md. Code Ann., Com. Law § 13-102(b)(1).  Enacted in reaction to "mounting concern over the increase of deceptive practices in connection

with sales of merchandise, real property, and services and the extension of credit," the CPA aims to increase public confidence in business practices.  Id. at § 13-103(a).  It applies to consumer contracts, goods, and services, id. at § 13-101.1, and generally provides penalties for unfair or deceptive trade practices.  See id. at §§ 13-301, 13-303.

Contrary to Evanston's assertions, neither PHIFA nor the CPA is "nearly but not exactly the same or alike" or has a "resemblance" to RESPA.  Although PHIFA and the CPA do and can apply to regulate aspects of real estate transactions, their particular subject matter is dissimilar.  RESPA regulates settlements, while PHIFA regulates foreclosure consulting services and the CPA affects consumer goods, services, and contracts more generally.  Although all three may share the ultimate goal of protecting consumers, vague coincidence of purpose is plainly not what is meant by exclusion (cc).  Stretching exclusion (cc) to encompass PHIFA and the CPA is to deprive the concept of similarity of its meaning.

## IV.  **CONCLUSION**

In accordance with the foregoing, the Court will enter summary judgment as to the duty to defend in favor of Cornerstone, will deny Evanston's Cross-Motion for Summary Judgment, and will vacate the portions of its previous orders to the contrary.  Because this decision concerns only the duty to

defend, this case will be reopened to permit further proceedings regarding the duty to indemnify as further stated in the accompanying Order.

_____/s/_____
William M. Nickerson
Senior United States District Judge

DATED: May 28, 2014